VALENTINE NICHOLSON *v.* ISRAEL PIM ET AL.

Where a bill in chancery is filed to recover the consideration paid on a contract for the purchase of real estate, after the contract of sale has been rescinded by the consent of both parties, and also to recover the value of the corn, wheat and potatoes growing on the land at the time of the rescission of the contract, and of hay taken off the land and in stack; and where the amount of the claim is to be reduced by the value of the use and occupation and injuries to the premises done by the purchasers, the respondent, after answering to the merits and submitting his defense to the court, comes too late to object to the jurisdiction of the court, upon the ground that the complainant had a plain and adequate remedy at law.

Where money is paid upon the purchase of real estate, and the contract is afterward rescinded by consent of the parties, upon an agreement that it shall be left to the honor of the vendor to pay back such *part* of the purchase money as shall be just and equitable, and he afterward refuses to pay any, a court will compel him to pay so much thereof as he, in justice and equity, ought to have paid.

IN Chancery.    Reserved in Champaign county.

The facts are stated in the opinion of the court.

*J. D. Burnet,* and *S. & R. Mason,* for complainant.

The rescinding agreement created such an obligation, on the part of Pim, as can be enforced against him in a court of equity. *Bryant* v. *Flight,* 5 Mees. & Wels. 114; *Jewry* v. *Busk,* 5 Taunt. 302; Parsons on Cont., vol. 1, 538, and notes.

The original contract being rescinded, and it being left to Pim —to his own sense of honor and justice—to refund and pay to complainant the amount which ought to be refunded and paid to him; the law implies a promise, on the part of Pim, to make the complainant a just and reasonable compensation for the money advanced and labor done, under the rescinded contract. *Gillet, Adm'r of Clemens,* v. *Maynard,* 5 Johns. R. 85, 87, 88; *Towers* v. *Barret,* 1 Term Rep. 133; *Van Eps* v. *Corporation of Schenectady,* 12 Johns. Rep. 436—441; Addison on Cont. 213; Chitty on Cont. (8th Am. ed.) 540; *James* v. *Cotton,* 7 Bing. 266; 5 M. &. P. 26.

*J. H. James,* and *B. Stanton,* for defendants.

KENNON, J.   The case stands in this court upon the bill and amendment, answer of Pim, and testimony.

Two questions are presented for the determination of this court. The first is, does the complainant make a case which entitles him to relief in any court; and the second is, if so, can he have that relief in a court of chancery ?

The solution of the first question depends entirely upon the evidence on file in the case.

The complainant was a member of an association calling themselves a " Community."   He and his associates, in the spring of 1844, contracted with Pim (the only defendant who has answered), to purchase from him five hundred acres of land in Champaign county, upon which they contemplated establishing their " Community."   By the article of agreement, they were to pay Pim for the land the sum of $15,000, in the manner following, that is to say: one half on or before the 1st of July, 1844, three thousand dollars in one year from the date of the article, and the balance in two years, with interest on all the payments, from the first of April, 1844.   The article of agreement was dated the 17th of March, 1844.

The complainant and his associates were put into possession of the premises on the 1st of April of that year.   Nicholson, out of his own funds, paid to Pim on the contract $3,000, and another member of the association paid $200; making in all $3,200 paid on the contract.   The association proceeded to make such improvements on the property as they deemed most calculated to promote their own interest.   They repaired the fences; cleared out and put under cultivation portions of the land, partially overgrown with hazel bushes; planted an orchard of choice fruit trees; repaired, to some extent, the mills on the premises; planted about fifteen acres of corn, twelve in one field and three in another; sowed about twenty acres of wheat; planted a considerable quantity of ground in potatoes; gathered and put up the hay on about fifty acres of the land.—All this was done before October, 1844.   The Community failed to complete the first payment, of $7,500.   About the first of October a difficulty arose between Pim and the society.   He wanted his money, and

they were unable to pay.   A meeting took place between Pim, on the one part, and Nicholson, and some other members of the Community, on the other, at which it was agreed that the articles of agreement, and other papers connected with the contract, should be delivered up to Pim, and be burned, and that possession of the premises should be restored to Pim ; all of which was done about the month of October, 1844—the Community having been in possession of the premises about six months.

Pim retained, and appropriated to his own use, a large portion of the corn, some of the potatoes, the wheat in the ground, and all the hay grown on the fifty acres.   These articles are proved to be of the value of about $500, which, with some other benefits which, it is claimed by the complainant, the defendant derived from the labor of the Community, amount in all, including the payment made, to about the sum of $4,000.

It is claimed, on behalf of the respondent, that the property was greatly damaged by waste, and otherwise ; and the testimony tends to prove that the defendant did sustain some damages in this respect, but how much would be very difficult to determine from the evidence on file in the case.   Indeed, the damages thus sustained are, to a great extent, a mere matter of opinion, and the witnesses differ very widely in their estimates.   How much ought to be deducted from the complainant's claim, if any thing, for these damages, and for the use of the premises for six months, the court will not, without a reference, undertake to determine. Nor will it determine what amount the complainant ought to recover, until the coming in of the report of a Master.   Enough, however, we think is shown in the case to warrant us in saying, that the complainant is entitled to a remedy, either in chancery or at law ; unless it is true, as claimed by the respondent, that all these matters were fully settled at the time the article was delivered up, and the possession restored to the respondent.

The respondent undoubtedly received of the complainant and one of his associates, $3,200 in cash, the hay before mentioned, as well as the wheat, corn and potatoes ; and it is equally true, that his premises were occupied by them only about six months. If, after the receipt of this money and personal property by Pim

(the respondent), the original contract had been simply rescinded, and the possession restored to the respondent, and nothing had been said about the purchase money, the law would give to complainant a remedy to recover back the money paid on the contract, less the value of the use and occupation of the premises, and such other proper set-offs and reductions as ought to be made, so as to put the parties in the same situation in which they were before the making of the contract.

But did the parties themselves settle these claims at the time the contract was rescinded and possession restored? If they did, and that fact appears from the evidence, the bill ought to be dismissed for want of merits.

To determine this question we must look to the testimony. It may be premised, that it appears from the evidence, that one of the articles of faith of the association was to suffer wrong rather than go to law, and that the defendant Pim was acquainted with that fact. That at the time the contract was rescinded, Pim said, if they wanted law, he would give them enough of it; and when it was proposed that the contract should be rescinded, and that he should pay back what he himself thought just and equitable, he said that was consistent with their professed principles, and he would accept of that proposition. This proposition, taken literally, was truly a favorable one to him, if in justice he owed any thing, and if he was to be the sole judge as to the amount, if any thing, which he himself would pay. There is some doubt, from the evidence, as to what were the terms upon which the contract was rescinded. The depositions of several witnesses are taken upon this point — one of whom was present when the contract was destroyed, and heard what took place between the parties. From his first deposition, it might be fairly inferred, that whether any thing should be paid back, was a matter entirely within the discretion of Pim; although, in a second deposition, he makes the case a little stronger for the complainant. This witness, upon cross-examination by defendant, gives his idea of how he thinks the matter was understood by Nicholson and Pim. He says he then supposed, from what took place, that Pim never intended to pay any thing, and that Nicholson

(who was opposed to law) expected that he would pay something.

Another witness (Jacob Borton) says, in substance, that after the contract of rescission had been made, Nicholson, Pim, and others, came to him and said the contract was rescinded, and related to him the terms of rescission, before the papers were destroyed, viz: That " the Community had agreed to give up to Pim all the premises purchased, all the crops, and improvements which had been added and cultivated on the premises, and leave it to the *honor* and *conscience* of Pim to refund and pay such an amount of the purchase money advanced, value of the crops, etc., as would be *just* and *equitable*." After this statement to the witness, of the terms of the rescinding contract, and to which the witness understood Pim to assent, the written contract of sale was burned; and, shortly after, Pim went into possession.

The depositions of other witnesses were taken on this same point; from which, we think, we are fully justified in finding that complainant and respondent both understood that something was justly due to complainant, and that he would pay that amount, whatever it might be.

If the amount to be paid was left to Pim's sense of honor and justice—to the court of his own conscience—it became a part of the rescinding contract, and raises the question, whether such contract had any obligatory force; whether Pim was bound to pay any thing, if he chose not to do so.

In the case of *Bryant* v. *Flight*, 5 Meeson and Welsby 114, the principle seems to be settled, that courts will hold such contracts binding; and if the party refuses to pay any thing, or what is right, courts will compel the party to do that which he ought to have done.

In that case, A agreed to enter into the service of B, and wrote him a letter, as follows: "I agree to enter into your service, as weekly manager, commencing next Monday; and the *amount* of payment I am to receive, I leave entirely with you." A did serve B for six weeks. The court held that the contract implied that A was to be paid *something*, at all events, for the service he had performed; and that the jury, on a *quantum*

*meruit* count, might ascertain what B, acting bona fide, would or ought to have paid. Other authorities support the same doctrine. And if no authorities could be found supporting such doctrine, still we would have no hesitation in saying that, in a case like the present, where the complainant must have understood, and where Pim himself must have known, that the complainant understood that he was to receive something, and he refuses to pay any thing, we would substitute the court or a jury in his place and do that which, in justice and equity, he ought to have done. So that we are satisfied, in this case, that the complainant had a claim against the respondent Pim, which he is entitled to recover, either in a court of law or equity; and that his own determination to pay nothing, is not binding on complainant.

And this brings us to the question, whether the complainant is in the right court. That he might have brought and sustained an action at law, I have no doubt; but it does not follow that he may not also have a remedy in a court of chancery.

There is no demurrer to the bill as amended. The case stands on bill and answer.

The bill shows that various items, of what might then be subject matter of the action of account, are claimed, and that these claims are liable to be reduced by use and occupation, and in various other ways. The whole case is one which could be much better settled by a master in chancery than by a jury; more time could be taken by him, and item after item examined, with more accuracy than in the trial by jury. A court of chancery would be well adapted to do full and ample justice to the parties.

The determination of this case necessarily involves matters of account; and no objection is taken to the jurisdiction until the case comes into this court. The defendant answers to the merits; testimony is taken; and now the respondent objects to the jurisdiction of this court, because the complainant has a plain and adequate remedy at law.

In the case of *J. & D. Ludlow* v. *Simond*, New York cases in error, vol. 2, p. 1, Chief Justice Kent, in delivering the opinion of the court, says chancery has concurrent jurisdiction, with

courts of law, in matters of account. Whether this jurisdiction originally arose from the necessity of obtaining a discovery, by the oath of the defendant, or in order to prevent a multiplicity of suits, is perhaps not material to inquire; since it has become well settled, in cases where that necessity does not exist, and where no difficulty would attend the remedy at law. And again, at page 53, he says : I know not of any rule limiting the cognizance of courts of chancery to one species of accounts more than another, or to matters of account against persons in any particular relation. Its jurisdiction extends to all matters of account between individuals, in whatever relation they may stand to each other. Nor is it necessary that the responsibility of the defendant should be established before you file the bill for an account. In most cases that responsibility, as well as the stating of the account, will be a point for litigation.

Justice Thompson, in the case above referred to, says : " I am inclined to think the respondent comes too late with an objection to the jurisdiction of the court, he having answered and contested the merits, the subject matter being within the jurisdiction of the *court.* This appears to me to be a reasonable rule, and calculated to save expenses. It is a good general principle, that where a party objects to the jurisdiction of the court, he ought to do it at the earliest opportunity." See same, page 40. Chief Justice Kent, in the same case, page 56, says : " But admitting the grounds, in the first instance, not to have been sufficient to have sustained the bill, the respondent comes too late to object to the jurisdiction of the court, after having put in an answer to the merits of the cause. By answering in chief, instead of demurring, he submitted his defense to the cognizance of the court, and equity will and ought, in such case, to retain the cause, provided the court be competent to grant the relief, and has jurisdiction of the subject matter, as it manifestly had in this case—the controversy being upon a matter of personal contract and of account." In support of this last position, Kent cites various authorities.

That case was very like the one under consideration, in many of its features.

After a careful consideration of the authorities, we are led to

the conclusion, that both questions made by respondent must be determined in favor of the complainant.